IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JEFFREY GARVEY,                          )
                                         )
                 Petitioner,             )
                                         )
        v.                               )        Case No. 4:13-cv-01635-AGF
                                         )
IAN WALLACE,                             )
                                         )
                 Respondent.             )

## MEMORANDUM AND ORDER

This matter is before the Court on the pro se petition of Missouri state prisoner

Jeffrey Garvey for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was

charged with four counts of first-degree statutory sodomy, one count of first-degree

statutory rape, two counts of first-degree child molestation, and one count of second-

degree domestic assault. The State dismissed the domestic assault charge before trial.

With respect to the statutory rape charge, after the close of evidence, the trial court found

that the evidence did not support a finding of sexual penetration during the relevant time,

and therefore instructed the jury only on the lesser-included offense of attempted

statutory rape in the first degree. Following trial, the jury found Petitioner guilty of all

counts, as modified. Petitioner was sentenced to concurrent sentences of 20 years on

each of the four statutory sodomy counts, 23 years on the attempted statutory rape count,

and 10 years on each of the two child molestation counts.

In his petition for federal habeas relief, Petitioner raises eight grounds for relief,

three alleging trial court errors during voir dire and trial, and five alleging ineffective

assistance of defense counsel for failing to investigate and introduce certain evidence and witnesses at trial.  For the reasons set forth below, habeas relief will be denied.

## BACKGROUND

### Trial

Trial commenced on April 28, 2009.  During voir dire, the State asked whether any venirepersons or their close friends or family members had been the victim of a sexual assault.  Several venirepersons, including venirepersons L.L. and C.L., responded affirmatively.  Venireperson L.L. indicated that she was the victim of a sexual assault by a stranger 15 or 16 years ago when she was 31 years old.  L.L. stated that she did not really think about the sexual assault anymore.  She further stated that she could follow the trial court's instruction and be fair to both sides. (Resp. Ex. B. at 39-40.)

Venireperson C.L. indicated that his wife had been sexually abused by her step-father when she was a child.  C.L. stated that while he and his wife had discussed the abuse at some point in the past, they had not continued to talk about it.  C.L. stated that he could be fair and impartial to both sides.  *Id.* at 42-43.

During Petitioner's portion of the voir dire, defense counsel asked L.L. and C.L. additional questions about whether their experiences would affect their ability to be fair and impartial.  In response to defense counsel's questioning, C.L. stated that it would not affect him if the allegations in this case were similar to what happened to his wife, that his wife's experience would not make him lean toward one side or the other, and that he could consider the full range of punishment.  *Id.* at 120-21.  L.L. likewise stated that it

would not affect her if the allegations in this case were similar to what happened to her and that she had no issues with considering the full range of punishment. *Id.* at 126-27.

The trial court struck for cause several venirepersons who were victims or relatives of victims of sexual abuse and who indicated that they could not be fair or impartial. However, defense counsel also challenged for cause seven venirepersons who were victims or relatives of victims of sexual abuse but who indicated that they could be fair and impartial, including L.L. and C.L. The trial court denied each of these challenges, except that the trial court struck one such venireperson because she had a hardship due to a medical appointment. *Id.* at 182-90. Both L.L. and C.L. served on the jury.

The evidence at trial showed the following. Petitioner dated a woman, T.B., from 2002 to 2006, during which time T.B. and her minor daughter, O.B., lived in Petitioner's house. O.B. was in third grade when her mother and she moved in with Petitioner, and O.B. was in seventh grade when they moved out. Throughout this time, T.B. would leave O.B. alone with Petitioner when T.B. had to work. O.B. had a history of behavioral problems, including attention-deficit/hyperactivity disorder ("ADHD"), which sometimes resulted in arguments in the household.[1]

On direct examination by the State, O.B. testified that, from the time she was in the fourth grade until she was in the sixth grade, Petitioner touched O.B.'s breasts and

---

[1] Petitioner also tried to introduce evidence that O.B. had a recent history of psychiatric treatment, for cutting herself and for attempted suicide, but the trial court ruled such evidence was inadmissible, and defense counsel did not make an offer of proof to preserve this issue for appeal.

vagina with his hands and tongue approximately two to three times a month when they were home alone together. O.B. testified that when she was in sixth grade, Petitioner started touching her vagina with his penis, and that Petitioner tried to have sexual intercourse with her on several occasions but succeeded only once, during the last attempt.

In February 2006, when O.B. was 13 years old and in the seventh grade, Petitioner and O.B. had an argument over what O.B. wanted to wear to school. Petitioner spanked O.B., resulting in an argument between T.B. and O.B. regarding how to discipline O.B., after which T.B. and O.B. moved out of Petitioner's house. Shortly thereafter, around Valentine's Day, Petitioner tried to reconcile with T.B. by sending T.B. flowers and sending O.B. a card with money in it. On or about February 18, 2006, T.B. asked O.B. to call and thank Petitioner for the card, but O.B. refused. When it appeared that T.B. was going to reunite with Petitioner, O.B. told her mother that she did not want to go back to Petitioner's house. T.B. pressed O.B. as to why, including by asking if Petitioner had touched O.B. inappropriately. O.B. responded to this question affirmatively. This was the first time that O.B. disclosed to T.B. that Petitioner had touched her inappropriately. T.B. took O.B. to the hospital the next day, and O.B. underwent a physical examination, including a pelvic examination, performed by Peter Berglar, M.D.[2]

On cross-examination by defense counsel, O.B. admitted that her previous statements as to the number of times Petitioner had sexual intercourse with her

_____

[2] Petitioner later had another pelvic examination performed by a different doctor, but that doctor did not testify at trial, and evidence of that examination was not introduced at trial, as it was cumulative of evidence of Dr. Berglar's examination.

contradicted her trial court testimony.  Specifically, O.B. admitted that, at a preliminary

hearing on July 2, 2006, O.B. testified that Petitioner had sexual intercourse with her

between 10 and 20 times.  Evidence was also introduced that, in a forensic interview at

the Children's Advocacy Center of Eastern Missouri on February 27, 2006, O.B. stated at

different points during the interview that Petitioner had sexual intercourse with her once

and that he did so multiple times.  No evidence was introduced regarding what O.B. said

in her deposition about the number of times Petitioner had sexual intercourse with her.

O.B. also testified on cross-examination that she could not describe the physical

appearance of Petitioner's penis, but O.B. testified during this line of questioning that she

believed "most penises look the same." *Id.* at 399.

After the close of the State's case, Petitioner called Dr. Berglar to testify about the

results of his pelvic examination of O.B. in February 2006.  Dr. Berglar testified that

O.B.'s pelvic examination was normal, her genitals appeared normal, and there was no

evidence of tearing, scarring, or notching around O.B.'s genitals.

On cross-examination, Dr. Berglar testified that he saw approximately six cases of

alleged sexual abuse per year during his five years of practice.  The State asked Dr.

Berglar about what he would expect to see in a pelvic examination if sexual penetration

had occurred six months before the examination.  Dr. Berglar indicated that, in such

cases, the hymen might appear normal or there could be notching, and that whether there

would be any physical findings would depend upon several factors, including the age of

the child, the amount of force used, and the amount of time that has elapsed.  He testified

that the absence of physical findings did not preclude the possibility that penetration had

occurred several months before the examination. The State then asked about Dr. Berglar's experiences in other examinations where sexual abuse was alleged. Defense counsel objected to this question as irrelevant, and the trial court overruled the objection. In response to the State's question, Dr. Berglar testified that there were no physical indicators of sexual abuse in the "overwhelming majority" of those examinations.

Petitioner also testified in his own defense and denied that he had any sexual contact with O.B. Petitioner testified about one instance when he walked in on T.B. taking photographs of O.B. and a female friend around the same age (12 or 13 years old at the time). The pictures were of the two girls in T.B.'s "adult clubbing clothes." Petitioner testified that he got upset about the pictures and sent the friend home.

After the close of evidence, the trial court found that there was not sufficient evidence of actual penetration to submit the statutory rape charge to the jury, but that there was sufficient evidence to submit the lesser-included offense of attempted statutory rape.

Before closing arguments, the trial court instructed the jurors that closing arguments were not evidence and that the jurors should base their verdicts on the evidence and the instructions. In closing argument, defense counsel argued that the inconsistencies in O.B.'s statements regarding the extent of sexual abuse showed that O.B. was lying. Defense counsel further argued that if witnesses lied to the jury about one thing, the jury "had to throw their testimony away." *Id.* at 608-09.

In rebuttal, the State argued that O.B.'s deposition testimony regarding the number of times Petitioner had sexual intercourse with her was consistent with her trial testimony, and that defense counsel had thus "lied" to the jury about O.B.'s testimony being contradictory. The State also argued that defense counsel "lied" when he told the jury that they had to take an "all or nothing" approach to O.B.'s testimony. Defense counsel objected to each of these statements as an improper personal attack on the attorney, and the trial court sustained both objections. Defense counsel did not ask for any further relief. *Id.* at 621-24.

## Direct Appeal

On direct appeal, Petitioner argued that (1) the trial court erred in denying Petitioner's challenges for cause to jurors C.L. and L.L., or that the court committed plain error in failing to further inquire into the qualification of these individuals; (2) the trial court plainly erred in failing to sua sponte declare a mistrial or to admonish the prosecutor after the prosecutor twice told the jury in closing argument that defense counsel had lied to them; and (3) the trial court erred in overruling Petitioner's objection to Dr. Berglar's testimony about the frequency with which he had found physical indications of sexual trauma in other pelvic examinations he had conducted.

The Missouri Court of Appeals rejected these claims. Regarding Petitioner's first claim, the appellate court found that a venireperson's past exposure to sexual abuse or assault did not automatically render him or her unqualified to serve on a jury involving similar allegations. Rather, the appellate court held, the relevant question is whether the venirepersons' experiences or views "would prevent or substantially impair their ability

to perform as jurors." *Id.* The appellate court found that because C.L. and L.L. both stated unequivocally that they could be fair and impartial, and that they could follow the trial court's instructions, the trial court did not err in refusing to strike these jurors for cause or in failing to conduct an independent inquiry into these jurors' qualifications.

Regarding Petitioner's second claim, the Missouri Court of Appeals held that the prosecutor's remarks during closing argument did not rise to the level of impropriety that would require a mistrial or further instruction. Specifically, the appellate court held that, under plain error review, improper closing arguments do not constitute reversible error unless the improper remark had a decisive effect on the outcome of trial. The appellate court found that, here, the prosecutor's rebuttal argument that defense counsel had lied was "based upon the prosecutor's interpretation of the evidence, namely that defense counsel was not being truthful in arguing that O.B.'s testimony was wholly inconsistent with her prior statements." (Resp. Ex. G at 12.) The appellate court found that because the jury was capable of determining which characterization of O.B.'s testimony was accurate, and because the jury was instructed that closing arguments were not evidence, the trial court did not plainly err in failing to sua sponte declare a mistrial or admonish the prosecutor.

Regarding Petitioner's third claim, the Missouri Court of Appeals held that the trial court did not abuse its discretion in admitting Dr. Berglar's testimony regarding his findings in other pelvic examinations involving allegations of sexual abuse. The appellate court held that the testimony was relevant to negate the inference raised by Petitioner that the absence of physical findings in O.B.'s pelvic examination undercut

O.B.'s allegations of sexual penetration. The appellate court further found that there was little prejudice to Petitioner. The appellate court noted that, although Dr. Berglar's testimony could support the State's theory that a lack of physical evidence does not exclude the possibility of penetration, it could also support an inference favoring Petitioner that "the majority of girls who alleged that they have been sexually abused are not truthful." *Id.*

## State Postconviction Proceedings

In his motion for postconviction relief, filed with the assistance of retained counsel, Petitioner claimed that his defense counsel at trial was ineffective in (1) failing to investigate T.B.'s mental health history, including that T.B. (like her daughter) had cut herself during adolescence, which might have impaired her credibility as a witness at trial; (2) failing to retain a children's sexual abuse expert to testify about the differences between pedophiles who are sexually attracted to pre-pubescent children and those attracted to post-pubescent adolescents to show that it would be unlikely for someone to commit both pre-pubescent and post-pubescent child molestation (as Petitioner had been accused of doing), and to testify that O.B. did not display behaviors typically displayed by child sexual abuse victims; (3) failing to investigate and call as a witness O.B.'s friend to corroborate Petitioner's testimony that he objected to T.B.'s taking of photographs of the two girls in adult clubbing clothes; (4) failing to introduce evidence about Petitioner's vitiligo, a medical condition which discolored Petitioner's skin to form what appeared to be an approximately two-inch wide birthmark under the head of Petitioner's penis, in order to impeach O.B.'s credibility (because O.B. could not describe Petitioner's penis);

and (5) failing to investigate or interview potential character witnesses to testify on behalf of Petitioner.[3]

An evidentiary hearing was held on February 2, 2012, at which Petitioner and defense counsel testified. With respect to Petitioner's first claim, Petitioner testified that he had asked defense counsel to investigate T.B.'s mental health history in order to determine whether there was a basis to attack her credibility. Defense counsel testified that he did not remember whether Petitioner requested him to investigate T.B.'s mental health but that defense counsel believed the best strategy at trial was to focus on impeaching O.B.'s credibility and to assert that O.B. lied out of anger at Petitioner for spanking her.

Regarding Petitioner's second claim, Petitioner testified that he had asked defense counsel to retain a children's sexual abuse expert to testify that O.B. did not display behaviors typically displayed by child sexual abuse victims and to testify regarding the differences between pedophiles attracted to pre-pubescent children and those attracted to post-pubescent adolescents, but that his attorney did not retain such an expert. Defense counsel testified that the reason he did not call such a sexual abuse expert was that he worried that it would open the door to evidence that O.B.'s psychiatric problems (namely, cutting herself and attempting suicide after the alleged abuse) were caused by Petitioner's

---

[3]     Petitioner also asserted two other claims which he does not raise in his federal habeas petition. In these claims, Petitioner asserted that defense counsel was ineffective in failing to preserve for appeal his attempt to introduce evidence of O.B.'s psychiatric treatment for cutting herself and attempting suicide, and defense counsel was ineffective in failing to retain a medical expert to rebut the State's theory that hymens heal rapidly such that there is not always physical evidence of penetration.

sexual abuse. Defense counsel further testified that, in his experience trying sexual abuse cases, there is not a common list of behaviors normally displayed by child sexual abuse victims.

With respect to Petitioner's third claim, defense counsel testified that he did not contact O.B.'s friend because defense counsel worried that the friend's testimony might favor O.B. or that the friend might know something about a video that counsel was hoping that the State would not discover or introduce.[4] Defense counsel further testified that he did not attempt to contact the friend because he did not believe that the issue of whether Petitioner objected to T.B. taking photographs of the two girls in adult clubbing clothes (the anticipated subject of the friend's testimony) was disputed.

With respect to Petitioner's fourth claim, Petitioner testified and introduced medical records to document that he suffers from vitiligo. Petitioner testified that he had told his attorney about the condition and the name of his treating physician. Petitioner also offered a photograph of his penis with the distinguishing mark as an exhibit in the post-conviction hearing. Defense counsel testified that O.B.'s testimony at the preliminary hearing regarding whether she noticed anything unusual about Petitioner's penis was too vague to indicate whether O.B. knew about Petitioner's vitiligo. Defense counsel testified that he worried that it would be too risky to get a more specific answer at trial from O.B. about whether she remembered anything about Petitioner's penis, especially because T.B. knew about Petitioner's vitiligo and might have told O.B. about

---

[4]     Defense counsel did not describe, and the record does not contain evidence of, the contents of this video.

it.  Defense counsel testified that if O.B. correctly described the appearance of Petitioner's penis at trial, it would have significantly bolstered her testimony.

Regarding Petitioner's final claim, Petitioner testified that he had given his attorney the names of several potential character witnesses, including business associates he knew from his ownership of a small business and friends he gained while training to be a pilot and playing in a local band.  Defense counsel testified that, although he talked generally about character witnesses with Petitioner, he did not call any character witnesses during trial because there was an issue in Petitioner's past that defense counsel did not want to come out on cross examination.[5]  Defense counsel further testified that he did not normally call character witnesses in sexual abuse cases because of problems that such witnesses have on cross-examination.[6]

The motion court rejected all of Petitioner's claims.  The motion court held that defense counsel's choice to focus on the inconsistencies in O.B.'s statements and on O.B.'s motive to lie because of her strained relationship with Petitioner was a reasonable exercise of trial strategy.  The motion court found that defense counsel reasonably chose not to attack T.B.'s credibility by using her mental health history because T.B. was not a witness to any of the alleged crimes.

The motion court further held that defense counsel made reasonable efforts to secure a children's sexual abuse expert, and his inability to locate any such experts who

---

[5]     Defense counsel did not describe, and the record does not indicate, what this issue was.

[6]     Defense counsel did call character witnesses during the sentencing phase of trial, namely, Petitioner's mother and one of Petitioner's friends.

would have given favorable testimony to Defendant, was not ineffective assistance of counsel.[7]

With respect to defense counsel's failure to call O.B.'s friend as a witness to testify about the photographs taken by T.B., the motion court held that defense counsel's strategy was reasonable because the photographs were not particularly provocative or significant to the charges against Petitioner. In any event, the motion court held, the photographs themselves and the circumstances surrounding the making of the photographs were put before the jury and further testimony from the friend would have been merely cumulative.

Regarding defense counsel's failure to introduce evidence of Petitioner's vitiligo, the motion court found that defense counsel had a rational basis for this strategic decision, as there was a significant risk that O.B. could accurately describe the physical mark on Petitioner's penis caused by the vitiligo, which would have only bolstered O.B.'s testimony.

Finally, the motion court held that defense counsel reasonably chose not to call character witnesses as the "dubious benefits" of such witnesses' testimony was not worth

---

[7]     The motion court's holding in this regard appears to misstate the record. Defense counsel testified at the post-conviction motion hearing that he only attempted to locate a medical expert to rebut the State's expert regarding the rapid healing of the hymen (a claim raised in Petitioner's postconviction motion but not in his federal habeas petition). As discussed above, defense counsel did not testify that he attempted to locate a children's sexual abuse expert; rather, he testified that he chose not to call such an expert because he worried that such testimony would open the door to unfavorable testimony, such as that O.B.'s self-harming behavior was indicative of sexual abuse. But counsel did testify that, based on his experience in trying sexual abuse cases, there is no common list of behaviors displayed by victims.

the risk that the witnesses would provide unfavorable testimony on cross-examination. (Resp. Ex. I at 55.)

The Missouri Court of Appeals affirmed the denial of postconviction relief on all claims, holding that defense counsel's actions were well within the boundaries of reasonable trial strategy and that Petitioner had not shown that different choices would have changed the outcome of the trial.

**Federal Habeas Petition**

In his federal habeas petition, Petitioner asserts that his constitutional rights were violated by (1) the trial court's denial of Petitioner's challenges for cause to jurors C.L. and L.L.; (2) the trial court's failure to sua sponte declare a mistrial or admonish the prosecutor for his comments during closing argument; (3) the trial court's admission of Dr. Berglar's testimony about the results of other pelvic examinations; (4) defense counsel's failure to introduce evidence of T.B.'s mental health history; (5) defense counsel's failure to secure a children's sexual abuse expert to explain the differences between pedophiles who are sexually attracted to pre-pubescent children and those attracted to post-pubescent adolescents;[8] (6) defense counsel's failure to investigate and call as a witness O.B.'s friend to corroborate Petitioner's testimony that he objected to T.B.'s taking of photographs of the two girls in adult clubbing clothes; (7) defense counsel's failure to introduce evidence about Petitioner's vitiligo; and (8) defense

---

[8] In his federal habeas petition, Petitioner does not mention that he sought such an expert to testify that O.B. did not display behaviors typically displayed by child sexual abuse victims.

counsel's failure to investigate or interview potential character witnesses to testify on behalf of Petitioner.

Respondent argues that Claims 2 and 3 are not properly before this Court. Respondent argues that Claim 2, regarding the trial court's failure to declare a mistrial or admonish the prosecutor for improper closing argument, was defaulted in the state trial court because Petitioner did not ask the trial court for such relief. Respondent argues that, although the state appellate court exercised its discretion to review this claim for plain error, such plain-error review does not excuse the default so as to permit federal habeas review. Respondent argues that Claim 3, regarding the trial court's admission of Dr. Berglar's testimony about other examinations, asserts an error of state law that is outside the scope of federal habeas review. In any event, Respondent argues that all of Petitioner's claims lack merit.

In his reply, Petitioner argues that the Court should consider the merits of each of his claims because each claim asserts a deprivation of Petitioner's constitutional right to a fair trial.

## DISCUSSION

Where a claim has been adjudicated on the merits in state court, the Antiterrorism and Effective Death Penalty Act ("AEDPA") provides that application for a writ of habeas corpus cannot be granted unless the state court's adjudication:

1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

> "[C]learly established Federal law" for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions. And an 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (citations omitted).

## **Trial Court Errors (Claims 1-3)**

### *Claim 1 (failure to strike jurors for cause)*

Under the Sixth Amendment, "the accused shall enjoy the right to . . . an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). In federal habeas proceedings, the district court must afford the state trial court "substantial deference in determining juror bias." *Munt v. Grandlienard*, 829 F.3d 610, 615 (8th Cir. 2016). In order to prove actual bias, the habeas petitioner must "point to clear and convincing evidence that [the juror in question] made an impermissible affirmative statement that is unequivocal." *Id.* (citation omitted).

Here, Petitioner has pointed to no such evidence. Indeed, the only unequivocal statements that jurors C.L. and L.L. made were that, in fact, they could be fair and

impartial, they could follow the trial court's instructions, their past experiences would not affect their ability to be impartial, and they could consider the full range of punishment. Accordingly, the Court will deny Claim 1.

### Claim 2 (failure to sua sponte declare a mistrial or admonish the prosecutor)

Respondent correctly asserts that Claim 2 was procedurally defaulted in state court because Petitioner never asked the trial court to declare a mistrial or to admonish the prosecutor for improper closing argument. *See State v. Johnson*, 663 S.W.2d 265, 266 (Mo. Ct. App. 1983) (holding under Missouri law that a litigant failed to preserve his claim that the trial court should have declared a mistrial after a prosecutor's improper closing because the litigant's objection to the closing was sustained and the litigant did not ask for further relief). Under the doctrine of procedural default, a federal habeas court is barred from considering the merits of a claim not fairly presented to the state courts, absent a showing by the petitioner of cause for the default and prejudice resulting therefrom, or that he is actually innocent. *E.g., Gordon v. Arkansas*, 823 F.3d 1188, 1196 (8th Cir. 2016) (quotation and citation omitted). A state appellate court's discretionary plain-error review of an unpreserved claim does not constitute cause to excuse a procedural default. *Clark v. Bertsch*, 780 F.3d 873, 877 (8th Cir. 2015)

In any event, Claim 2 fails on the merits. The clearly established federal law is that "a prosecutor's improper comments will be held to violate the Constitution only if they so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (citation omitted). "Thus, [a federal court] may grant . . . federal habeas corpus relief only if the prosecutor's

closing argument was so inflammatory and so outrageous that any reasonable trial judge would have sua sponte declared a mistrial." *Sublett v. Dormire*, 217 F.3d 598, 600 (8th Cir. 2000) (citation omitted). "[T]he combination of the strict due process standard of constitutional review, the deferential review mandated by the AEDPA, and our less reliable vantage point for gauging the impact of closing argument on the overall fairness of a trial result[s] in an exceptionally limited review" of this issue. *Id.*

Here, Petitioner has not shown that the prosecutor's comments that defense counsel was "lying" about the inconsistencies in O.B.'s testimony, even if improper, so tainted the trial proceedings that Petitioner's right to due process was denied. The jury was instructed beforehand that closing argument was not evidence, and the state appellate court reasonably found that the jury was capable of determining which characterization of O.B.'s testimony was accurate. *See id.* at 601 (holding that concerns over a prosecutor's improper closing argument did not render a trial fundamentally unfair "in light of the jury's common sense ability to put aside a particular type of overzealous advocacy with the help of the court's standard instruction that arguments of counsel are not evidence"). Claim 2 will be denied.

### Claim 3 (admission of Dr. Berglar's testimony regarding other examinations)

It is not within a federal habeas court's province "to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Only when the "evidentiary ruling infringes upon a specific constitutional protection or is so prejudicial

that it amounts to a denial of due process" will the ruling justify habeas corpus relief. *Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006). "To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety the verdict probably would have been different." *Gee v. Groose*, 110 F.3d 1346, 1350 (8th Cir. 1997) (en banc); *see also Bounds v. Delo*, 151 F.3d 1116, 1119 (8th Cir. 1998).

Here, the Court cannot say that the trial court's evidentiary ruling was unreasonable. In any event, the trial court's evidentiary ruling, affirmed on appeal, did not infringe upon any constitutional protection and was not so prejudicial as to amount to a denial of due process. The state appellate court found that Dr. Berglar's testimony regarding his other examinations was relevant to negate the inference raised by Petitioner that the absence of physical findings in O.B.'s pelvic examination indicated that no sexual penetration occurred. But because the trial court reduced the statutory rape charge to attempt, the State did not need to prove that sexual penetration occurred in order to convict Petitioner. Therefore, there is no reasonable probability that the exclusion of Dr. Berglar's testimony would have changed the outcome of trial. The Court will deny Claim 3.

**Ineffective Assistance of Counsel (Claims 4-8)**

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To show ineffective assistance of counsel, a habeas petitioner must show both that "[his] counsel's performance was deficient" and that "the deficient performance prejudiced [his]

defense." *Id.* at 687; *see also Paulson v. Newton Corr. Facility*, 773 F.3d 901, 904 (8th Cir. 2014). To show deficient performance, the petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

"Judicial scrutiny of counsel's performance must be highly deferential," and the petitioner bears a heavy burden in overcoming "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "might be considered sound trial strategy." *Id.* at 689 (citations omitted). To show prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

When, as here, an ineffective assistance claim has been addressed by the state court, this Court must bear in mind that "[t]aken together, AEDPA and *Strickland* establish a 'doubly deferential standard' of review." *See Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (citation omitted). It is not sufficient for a petitioner to "show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). "Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.* at 699.

Here, the state courts reasonably held that defense counsel's strategy to focus on O.B.'s credibility by pointing out the inconsistencies in her previous statements, instead

of introducing the other impeachment evidence and witnesses suggested by Petitioner, did not constitute ineffective assistance of counsel. The state courts applied the correct legal principles to the claim and reasonably found that defense counsel did not perform deficiently in choosing not to introduce evidence of T.B.'s mental health history (Claim 4) and Petitioner's vitiligo (Claim 7), and choosing not to call as witnesses a children's sexual abuse expert (Claim 5), O.B.'s friend (Claim 6), and character witnesses (Claim 8). Moreover, in light of the other evidence of Petitioner's guilt at trial—most importantly, O.B.'s testimony—the state courts reasonably found that the outcome of the trial would not have been different had defense counsel introduced such evidence.

With respect to defense counsel's decision not to introduce evidence of T.B.'s mental health history and of Petitioner's vitiligo (Claims 4 and 7, respectively), "how much to impeach a witness is generally a matter of trial strategy left to the discretion of counsel." *Dansby v. Hobbs*, 766 F.3d 809, 835 (8th Cir. 2014). As the state courts noted, T.B. was not a crucial witness for the State in this case, as she had no personal knowledge of the alleged crimes. Thus, even if the fact that she suffered from mental health issues in adolescence was admissible at trial, there is little chance that introduction of such evidence would have changed the result of trial.

Likewise, although it is a closer call, it was not unreasonable for the state courts to find that defense counsel exercised sound trial strategy in deciding not to introduce evidence of Petitioner's vitiligo, given the risk that O.B. knew about the condition. But even if defense counsel's performance in this regard was deficient, it was not sufficiently prejudicial. O.B.'s testimony did not indicate how much attention she paid to the

appearance of Petitioner's penis during the various instances of abuse, so impeachment on this issue would not have been likely to significantly impair her credibility.

With respect to defense counsel's decision not to retain a children's sexual abuse expert to testify about the differences between pedophiles who are attracted to younger children and those attracted to older children (Claim 5), Petitioner has not (either in his state court motion for postconviction relief or in his federal habeas petition) presented any evidence or basis to believe that such an expert existed who would have been available and provided favorable testimony. Nor has Petitioner indicated how such testimony would have benefitted him at trial, particularly considering that O.B. alleged abuse during a relatively short time frame (fourth to sixth grade) during which it was not suggested that she aged or matured significantly. Thus, although defense counsel did not attempt to contact such an expert (contrary to the state postconviction court's findings), defense counsel's failure in this regard did not rise to the level of ineffective assistance of counsel.

Finally, with respect to defense counsel's failure to call as witnesses O.B.'s friend and character witnesses (Claims 6 and 8, respectively), the state courts reasonably concluded that these decisions were matters of sound trial strategy, given the risk that these witnesses would testify unfavorably and may know about evidence that defense counsel did not want disclosed to the State. But even if defense counsel's failure to call these witnesses constituted deficient performance, Petitioner has not demonstrated prejudice. Even if O.B.'s friend's would have corroborated Petitioner's testimony that he objected to T.B.'s taking of photographs of the two girls in adult clubbing clothes, as

Petitioner hoped, this issue was not particularly significant to the charges against Petitioner. Likewise, although Petitioner has identified potential character witnesses in the form of his business associates and friends, Petitioner has not shown that these character witnesses would have provided compelling evidence to disprove the evidence of Petitioner's guilt. *Kornhardt v. United States*, No. 4:13-CV-214 CAS, 2016 WL 898881, at *12 (E.D. Mo. Mar. 9, 2016) (holding that, in view of the evidence against the petitioner, the petitioner had not shown that defense counsel's failure to call character witnesses would have changed the outcome of trial).

For these reasons, the Court will deny Claims 4 through 8.

## CONCLUSION

The Court concludes that Petitioner is not entitled to federal habeas relief. Furthermore, the Court does not believe that reasonable jurists might find the Court's assessment of the procedural or substantive issues presented in this case debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. § 2254(d)(2). *See Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003) (standard for issuing a Certificate of Appealability) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Jeffrey Garvey for a writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability shall not be issued in this case.

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 29th day of September, 2016.